**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LILLIE W. COLSTON**<br>2718 12TH Street, NE<br>Washington, DC 20018,<br><br>      **Plaintiffs,**<br><br>  vs.<br><br>**FIRST GUARANTEE COMMERCIAL**<br>**MORTGAGE CORPORATION**<br>7201 Downing Court<br>Clarksdale, MD 21029,<br><br>    **Serve:**  Steven M. Sushner<br>             1737 17th St NW,<br>             Washington, DC 20009<br><br>**LEHMAN BROTHERS BANK, FSB,**<br>Brandywine Building<br>1000 West St., Suite 200<br>Wilmington, DE 19801<br><br>    **Serve:**  Mayor's Office,<br>             DCRA, Corp. Division<br>             941 N. Capitol St NE<br>             Washington, DC 20002,<br><br>**UNKNOWN DEFENDANT ASSIGNEES,**<br><br>      **Defendant.** | **Case No.** |

**NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT BASED ON FEDERAL**
**QUESTION AND DIVERSITY JURISDICTION**

    Defendant Lehman Brothers Bank, FSB (**LBB**), pursuant to 28 U.S.C. §§ 1331, 1332,

1441 and 1446, hereby removes this action from the Superior Court of the District of Columbia

to the United States District Court for the District of Columbia, and states as follows:

### I. STATEMENT OF THE CASE

    1.    On March 14, 2009, an action was commenced in the Superior Court of the

District of Columbia, styled *Lillie W. Colston v. First Guarantee Commercial Mortgage Corp.,*

*et al.,*[1] Case No. C 09-1804 (**Superior Court Action**).  A copy of the summons directed to LBB

---

[1]    It appears that the spelling of "First Guaranty Commercial Mortgage Corporation" is
incorrect in the caption of the Complaint.

and a copy of the complaint (**Compl.**) in the Superior Court action are attached hereto as **Exhibit 1**. The complaint alleges causes of action based on the plaintiff's home mortgage re-financings, which took place in March 2006 and January 2007.

2.      The complaint purports to assert five causes of action, which plaintiff characterizes as follows: (1) violation of the D.C. Consumer Protection Procedures Act (**CPPA**), D.C. Code § 28-3901, against LBB and its assignees, (2) violation of the CPPA, § 28-3904, against First Guaranty Commercial Mortgage Corporation (**First Guaranty**), LBB, and assignees, (3) "unconscionably" (*sic*) against all defendants, (4) violation of the federal Truth-in-Lending Act (**TILA**), 15 U.S.C. §§ 1601, *et seq*. against all defendants, and (5) violation of the D.C. Mortgage Loan and Broker Act, D.C. Code § 26-1101, *et seq*. against First Guaranty.

## II. FEDERAL COURT JURISDICTION

3.      This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because plaintiff's fourth claim arises under the laws of the United States, namely TILA. In that cause of action, plaintiff accuses defendant LBB of failing to make required disclosures related to her home mortgage re-financings. (Compl. ¶¶ 60-67).

4.      The Court has supplemental jurisdiction over the remaining state law claims because they "form part of the same case or controversy." 28 U.S.C. § 1367(a). A state claim is part of the same case or controversy as a federal claim if they share a "common nucleus of operative fact" with the federal claim. *E.g.*, *Decatur Liquors, Inc. v. Dist. of Columbia.*, 478 F.3d 360, 362 (D.C.Cir. 2007).

5.      The first cause of action alleges LBB made a loan to the plaintiff without considering her ability to pay. (Compl. ¶ 44). It further challenges LBB's loan origination, funding, and securitizing practices in reference to plaintiff's loan. (Compl. ¶¶ 46-48). As such, it raises issues about the negotiation and origination of the same loan as that at issue in the TILA claim.

6.      The second cause of action alleges, *inter alia*, at least seven ways in which defendants allegedly failed to make material disclosures related to plaintiff's mortgage,

purportedly in violation of District of Columbia law.  (Compl. ¶ 52(c)-(i)).  It therefore implicates the same activities as the TILA claim.

7.     The third cause of action alleges common law unconscionability, including procedural unconscionability in the negotiation of the loan.  (Compl. ¶ 59).  It therefore raises issues related to the negotiation and origination of the loan, in common with the TILA claim.

8.     The fifth cause of action alleges that First Guaranty violated the Mortgage Loan and Broker Act by receiving fees or other payments in connection with placing plaintiff's mortgage with LBB or Homecomings Financial.  (Compl. ¶ 71).  It therefore raises issues related to the negotiation and origination of the loan, in common with the TILA claim.

9.     Due to the interrelationship of plaintiff's state law and TILA causes of action, the Court should extend supplemental jurisdiction over all of plaintiff's state law claims.  The claims all involve the origination or negotiation of the loan, just as does the federal TILA claim.  These claims would undoubtedly be tried together, meeting the test for a single case or controversy. *See Egilman v. Keller & Heckman, LLP*, 401 F.Supp.2d 105, 114 (D.D.C. 2005) (*citing United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

### III. DIVERSITY JURISDICTION

10.     This Court also has jurisdiction to hear this matter under 28 U.S.C. § 1332 because of the complete diversity of citizenship of the parties.

11.     Plaintiff, an individual, is a citizen of the District of Columbia.  (Compl. ¶ 6).

12.     According to the complaint, co-defendant First Guaranty is a Maryland corporation with its principal place of business in Maryland.  (Compl. ¶ 7).

13.     LBB is a federal savings bank.  Pursuant to the recent amendment to the Home Owners' Loan Act, codified at 12 U.S.C. § 1464(x), a federal savings association's citizenship for diversity purposes is "the state in which such savings association has its home office."  LBB has its home office in Wilmington, Delaware, as set forth in its federal stock charter, dated June 30, 1999, as attested by the bank and the corporate secretary of the Office of Thrift Supervision.  A

copy of the federal stock charter is annexed hereto as **Exhibit 2**.  Therefore, LBB is a citizen of Delaware.

14.     Because no defendant has the same citizenship as the plaintiff, there is complete diversity of citizenship.

15.     In this case, plaintiff seeks to rescind the loan in question.  (Compl. at 13, ¶ F [prayer for relief]).  According to the complaint, the principal amount of the loan increased to over $400,000 after the January 2007 re-financing.  (Compl. ¶ 32).  Therefore, the amount in controversy is over $75,000, satisfying the requirement of 28 U.S.C. § 1332(a).

16.     Neither of the defendants is a citizen of the same state as plaintiff.  Nor is any defendant a citizen of the District of Columbia.  Therefore, this case may be removed based on diversity of citizenship jurisdiction.

## IV. ALL PROCEDURAL REQUIREMENTS FOR
## REMOVAL HAVE BEEN SATISFIED

17.     Removal of this action is timely. According to the Superior Court's online case information system, plaintiff filed proof of service on April 14, 2009, claiming service on LBB had been effected on April 6, 2009.  Without waiving any defense LBB may have based on insufficiency of service of process, LBB admits that it did receive a copy of the summons and complaint by mail sometime after March 30, 2009.  Therefore, removal is made within thirty days of LBB learning of the action, in accordance with 28 U.S.C. § 1446(b).

18.     Based on a review of the Superior Court's docket for this matter, plaintiff claims to have served co-defendant First Guaranty on or about March 31, 2009.  Counsel for First Guaranty, Gerald Chapman, Esq., informed counsel for LBB that he takes the position that First Guaranty has not been served.  Notwithstanding, Mr. Chapman represented to counsel for LBB that First Guaranty consents to the removal of this action.

19.     Pursuant to 28 U.S.C. § 1446(a), this firm attempted to obtain a true and correct copy of all of the process, pleadings, and orders on file in the Superior Court action.  The records that should exist are listed on a printout of the online case information page from the Superior

Court, which is annexed hereto as **Exhibit 3**. It shows the following process and pleadings have been filed: (a) complaint, (b) summons directed to LBB, (3) summons directed to First Guaranty, (d) affidavit of service on LBB, and (5) affidavit of service on First Guaranty, and (6) the Initial Order and Addendum dated March 14, 2009, showing assignment of the case to Judge Natalia Combs Greene. The initial order is annexed hereto as **Exhibit 4.**

Unfortunately, when we sent a representative to the Superior Court to obtain copies of these documents, they were unavailable for copying because the court had taken them to be scanned. We also attempted to obtain copies of these documents from plaintiff's counsel, Mr. Wilson, but he did not have copies of the needed documents. Defendant LBB will file copies of the missing documents with this Court when they become available.

## V. CONCLUSION

By this notice of removal and the associated attachments, defendant LBB does not waive any objections it may have as to service, jurisdiction or venue, or any other defenses or objections it may have to this action. LBB intends no admission of fact, law or liability by this notice, and expressly reserves all defenses, motions and/or pleas. LBB prays that the Superior Court action be removed to this Court, that all further proceedings in Superior Court be stayed, and that LBB receive all additional relief to which it is entitled.

Dated: April 28, 2009                Respectfully submitted,

                                     **AKERMAN SENTERFITT LLP**

                                     _____
                                     James R. Steele
                                     (D.C. Bar. No. 498471)
                                     8100 Boone Blvd, Suite 700
                                     Vienna, VA 22182
                                     (703) 790-8750
                                     jr.steele@akerman.com

                                     Attorneys for Defendant
                                     LEHMAN BROTHERS BANK, FSB

# EXHIBIT 1

CA Form 1

## Superior Court of the District of Columbia
### CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C. 20001   Telephone:   879-1133

Lillie W. Colston

*Plaintiff*

VS.

First Guaranty Commercial Mortgage Corporation, et al.,

*Defendant*

0001864-09

Civil Action No.

### SUMMONS

To the above named Defendant: *Lehman Brothers Bank, FSB*

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon your exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear **below.** If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue, N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

Albert Wilson, Jr. (486546)

Name of Plaintiff's Attorney

700 12th Street, NW, Ste. 700

Address

Washington, DC 20005

(202) 558-5170

Telephone

By

Deputy Clerk

Date   3/19/09

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

Form CV(6)-450/Mar. 93

**NOTE:** SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT *FAIL TO ANSWER WITHIN THE REQUIRED TIME*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-1161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning where you may ask for such help.

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| LILLIE W. COLSTON<br>2718 12th Street, NE<br>Washington, DC 20018,<br><br>　　　　　Plaintiffs,<br><br>　　　vs.<br><br>FIRST GUARANTEE COMMERCIAL<br>MORTGAGE CORPORATION<br>7201 Downing Court<br>Clarksdale, MD 21029,<br><br>　　Serve:　Steven M. Sushner<br>　　　　　1737 17th St NW,<br>　　　　　Washington, DC 20009<br><br>LEHMAN BROTHERS BANK, FSB,<br>Brandywine Building<br>1000 West St, Suite 200<br>Wilmington Delaware 19 801,<br><br>　　Serve:　Mayor's Office,<br>　　　　　DC RA, Corp. Division,<br>　　　　　941 N. Capitol St NE,<br>　　　　　Washington, DC 20002,<br><br>UNKNOWN DEFENDANT ASSIGNEES,<br><br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.:　　　　　000****-09

COMPLAINT
(ACTION INVOLVING REAL PROPERTY)


JURY LEGAL TRIAL DEMANDED

RECEIVED
Civil Clerk's Office
MAR 1 4 2009
Superior Court of the
District of Columbia
Washington, D.C.

## INTRODUCTION

1.　　Plaintiff, Lillie W. Colston, brings this action to seek redress against abusive

mortgage refinancing practices that have jeopardized her home.  Collectively, defendants

targeted Ms. Colston, took advantage of her lack of sophistication in financial matters,  induced

her to refinance her mortgage seven times in seven years, and qualified her for unsuitable loans that did not substantially benefit her in violation of federal and District of Columbia laws.

2.     Ms. Colston's District of Columbia claims arise in part under the District of Columbia Consumer Protection Procedures Act ("CPPA") D.C. Code § 28 3901 *et seq.* which protects consumers against unfair and deceptive trade practices. Among other things, the CPPA prohibits mortgage lenders from making loans if there is a reasonable probability a consumer cannot repay and from making loans from which the consumer does not receive a substantial benefit.

3.     Ms. Colston's District of Columbia claims also arise in part under the District of Columbia Mortgage Lender and Broker Act ("MLBA"), D.C. Code § 26-1101 et seq. which provides for the licensing and regulation of mortgage lenders and mortgage brokers. Among other things, the MLBA regulates loan disclosures and execution of agreements.

4.     Ms. Colston asserts claims against Defendant Lehman Brothers Bank, FSB and any other defendant assignee of the Lehman Brothers mortgage based on violations of the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") and a corollary D.C. statute, D.C. Code § 28-3301 *et seq.*

## JURISDICTION

5.     Jurisdiction of this court is founded upon §§ 11-921, 28-3905(k), 28-3314, and 13-423 of the D.C. Code.

## PARTIES

6.     Plaintiff Lillie W. Colston resides at 2718 12th St., NE, Washington, DC 20018 ("property").

7.      Defendant First Guaranty Commercial Mortgage Corporation ("First Guaranty") is a Maryland corporation whose place of business is 7201 Downing Court, Clarksville, MD 21029. Upon information and belief, First Guaranty is licensed as a mortgage broker in the District of Columbia.

8.      Defendant Lehman Brothers Bank, FSP ("Lehman Brothers") is a federal savings bank upon information and belief, Lehman Brothers is headquartered at the Brandywine building, 1000 West St., Suite 200, Wilmington, DE 19801. Upon information and belief, Lehman Brothers regularly originates in purchases loan secured by homes in the District of Columbia. Upon information and belief, Defendant Lehman Brothers is not a license mortgage lender in the District of Columbia.

9.      The identities of the assignees of Ms. Colston's mortgage are unknown at this time. Upon information and belief, Ms. Colston's mortgages were securitized and assigned to currently unknown trusts and purchased by unknown investors. These entities are collectively referred to as the "Defendant Assignees."

## FACTS

10.     Ms. Colston is a 76-year-old, African-American woman who has owned her home at 2718 12th St., NE, Washington, DC 2008 since 1976.

11.     In 1997, Ms. Colston's daughter, Patricia Ann Wilson, was added to the deed as a joint tenant.

12.     Ms. Colston currently lives with her 12-year-old great-nephew.

13.     Ms. Colston completed the 12th grade. Her various jobs included working in a hospital and laundry facility. She retired in 1994.

14.     Currently, Ms. Colston receives Social Security and a pension of less than $1600 a month.

15.     For approximately seven years, Ms. Colston was repeatedly solicited with telephone calls and mailings to refinance the existing mortgages on her home.  The representations and promises made in the solicitations were particularly attractive to Ms. Colston because of her desire to have a mortgage that would be affordable on her limited pension and Social Security retirement income.

16.     Ms. Colston obtained a refinancing every year for the last seven years.

17.     Each of Ms. Colston's two most recent refinancing was a result of repeated solicitation from "Art" at First Guaranty.  Upon information and belief, Arthur R. Berst, Jr. was the First Guaranty representative who repeatedly contacted Ms. Colston.

18.     First Guaranty initiated the refinances in March 2006 and January 2007.  First Guaranty promised Ms. Colston that she could take advantage of better rates and obtain a fixed-rate mortgage.

### March 2006 refinance: Lehman Brothers Bank, FSB

19.     At the beginning of 2006, Ms. Colston had a mortgage on her home of approximately $328,000.  She was solicited by First Guaranty for a refinance of her mortgage.  First Guaranty promised better interest rates than her existing mortgage and a fixed-rate mortgage.

20.     Ms. Colston provided First Guaranty with documentation of her income and bank accounts.

21.    Art Berst of First Guaranty allegedly conducted an interview and finalized a loan application. The loan application was dated March 16, 2006—the same day as the closing.

22.    Although she requested a fixed rate mortgage, Ms. Colston received an adjustable rate mortgage. Her monthly mortgage payment did not lower as promised.

23.    The principal amount of the new loan increased from $327,950.91 to $378,400. Ms. Colston paid $20,939.38 in fees and costs to settle the loan. This included a mortgage broker fee of $7,606. This amount does not include a GMAC payoff.

24.    At this time, the amount of a prepayment penalty to repay her previous loan has not been determined.

25.    The March 16, 2006 Loan Application failed to list Ms. Colston's monthly income.

26.    Further, the March 16, 2006 Loan Application erroneously repeated that Ms. Colston had $105,000 in personal property.

27.    Ms. Colston's income in March 2006 was insufficient to repay the loan and pay for household expenses.

### January 10, 2007 refinance: homecoming financial

28.    Just ten months after her previous refinance, First Guaranty again solicited Ms. Colston for another refinance of her mortgage. Again, First Guaranty promise lower rates and a fixed-rate mortgage.

29.    Ms. Colston again provided First Guaranty with documentation of her income and bank accounts.

30.     Art Berst of First Guaranty allegedly conducted an interview and finalized the Loan Application.  The Loan Application was dated January 10, 2007 — the same day as the closing.

31.     First Guaranty provided Ms. Colston with a negative amortization option adjustable-rate mortgage, not the fixed-rate mortgage product as promised.

32.     The principal amount of the new loan increased from $381,891.00 to $401,800.00. Ms. Colston paid $18,362.72 in fees and costs to settle the loan.  This included a broker fee of $11,452.

33.     At this time, the amount of a repayment penalty to repay her previous loans has not been determined.

34.     The January 10, 2007 Loan Application erroneously represented that Ms. Colston received a monthly pension of $6,532.20 and Social Security benefits of $2051.87 per month, when in fact Ms. Colston's total monthly income was less than $1,600 per month.

35.     Further the January 10, 2007 Loan Application erroneously represented that Ms. Colston had $105,000 in personal property.

### January 10, 2007 HELOC: Homecomings Financial

36.     On January 10, 2007, Ms. Colston obtained a home equity line of credit from Homecomings Financial.

37.     First Guaranty received a broker fee of $150 paid outside of contract.

*Origination and Assignment of Ms. Colston's Mortgages*

38.    On information and belief, Ms. Colston's mortgages were securitized and assigned to currently unknown trust and purchased by unknown investors ("Defendant Assignees.")

39.    On information and belief the complex, unaffordable, and unconscionable mortgages extended to Ms. Colston are based on mortgage products and documentation and underwriting guidelines created by defendant Lehman Brothers and their secondary market partners, all of whom promoted underwrote, and ultimately paid incentives to employees or brokers for each of the loans at issue.

## COUNT 1
### (VIOLATION OF THE DC CONSUMER PROTECTION PROCEDURES ACT ("CPPA") AGAINST LEHMAN BROTHERS BANK, AND DEFENDANT ASSIGNEES)

40.    Plaintiff repeats the allegations of the preceding paragraphs as if fully set forth herein.

41.    The District of Columbia, in order to protect consumers from unfair and misleading practices and to provide consumers with proper redress of grievances, enacted the consumer protection procedures act ("CPPA"), D.C. Code § 28-3901, *et seq.*

42.    The CPPA applies to consumer credit loans secured by residential property

43.    A consumer who suffers damages as a result of violation of the CPPA may bring an action and recover treble damages, attorney's fees, punitive damages, and other appropriate relief.

44.    Defendant Lehman Brothers and its defendant assignees made, funded, and securitized unconscionable loan to Ms. Colston in violation of D.C. Code § 28-3904 (r)(1), which

prohibits the making of loans without regards to a consumer's ability to repay the loan. D.C. Code § 28-3904 (r).

45.     Defendant Lehman Brothers and its Defendant Assignees had knowledge that the Income section of Ms. Colston's, Residential Loan Application was missing. Further, Defendants had knowledge that the Asset section was inflated.

46.     Defendant Lehman Brothers and its Defendant Assignees' practice of originating, funding, and securitizing mortgages without consideration of actual income or ability to repay is an unfair and deceptive practice under the CPPA.

47.     Defendant Lehman Brothers, acting in concert with unknown defendant assignees, through their actions in promoting, underwriting, and ultimately funding as close as loan violated the CPPA by paying yield spread premiums and/or other financial incentives to brokers and lenders to originate ARMs that are underwritten so that borrowers like Ms. Colston will be forced to refinance or go into default because of the inability to repay.

48.     Defendant Lehman Brothers acting in concert with unknown Defendant Assignees, through their actions in promoting, underwriting and ultimately funding Ms. Colston's loan violated the CPPA by paying financial incentives to originate loans which Ms. Colston could not pay based on her actual income.

49.     Defendant Lehman Brothers and its Defendant Assignees' violations of the CPPA were intentional, willful, and wanton and justify the imposition of treble and punitive damages as well as attorney's fees and costs.

COUNT II
VIOLATION OF THE CPPA
(AGAINST FIRST GUARANTY, LEHMAN BROTHERS, AND DEFENDANT ASSIGNEES)

50.     Plaintiff repeats the allegations of the preceding paragraphs as if fully set forth herein.

51.     Defendant solicited, brokered an extent a complex and unconscionable loans to Ms. Colston in violation of D.C. Code § 28-3904 by, *inter alia*:

   a.   Refinancing Ms. Colston's mortgage without providing her substantial benefit. D.C. Code § 28-3904(r)(2). Indeed, each of the refinancings worked to Ms. Colston's substantial detriment—amongst other things, causing her to pay some combination of substantial costs and fees, and/or prepayment penalties and or negative amortization;

   b.   Extending mortgage loans to Ms. Colston with knowledge that there was no reasonable expectation she would be able to repay the mortgage as structured, in violation of D.C. Code § 28-3904(r)(1);

   c.   Knowingly took advantage of Ms. Colston's inability to protect her own interests by reason of age, physical infirmities, lack of sophistication, and other factors, in violation of DC Code § 28-3904(r)(5)

52.     Defendants committed unlawful trade practices under D.C. Code § 28-3904 by, *inter alia*:

   a.   Materially misrepresenting  the benefits to Ms. Colston of refinancing her mortgages in the terms of the mortgages, in violation of § 28-3904(e);

   b.   Materially misrepresenting  that the mortgages would have fixed rates, in

violation of section 28-3904 (a) & (e);

c.   Failing to state material facts regarding the escalating adjustable-rate payments that were imposed under the terms of the ARMs they sold Ms. Colston, in violation of § 28-3904(f);

d.   Failing to inform Ms. Colston that refinancing the mortgages with prepayment penalties prior to the expiration of the penalty period would impose significant costs, in violation of section 28-3904(f);

e.   Promising Ms. Colston that her monthly payments would go down when, in fact, the monthly payments were scheduled to go higher at unaffordable levels, in violation of section 28-3904(a) &(e);

f.   Failing to tell Ms. Colston that the ARM products they sold her would add to the principal balance on her mortgage, in violation of section 28-3904(f);

g.   Falsely stating to Ms. Colston at the mortgage services were required, in violation of section 28-3904(k);

h.   Representing that the mortgages were supplied in accordance with a previous representations when they were not, in violation of section 28 – 3904(u);

i.   Failing to make required loan disclosures in violation of section 28-3904(hh).

53.   These misrepresentations of material facts or failures to state material facts were made with knowledge that they were false or that their omission would create a false understanding.

54.   Ms. Colston justifiably relied on these misrepresentations and/or failures to state material facts.

55.     Defendants' violations of the CPPA were intentional, willful, and wanton and justify the imposition of treble and punitive damages as well as attorney's fees and costs.

## COUNT III
## UNCONSCIONABLY
## (AGAINST ALL DEFENDANTS)

56.     Plaintiff repeats the allegations of the preceding paragraphs as if fully set forth herein.

57.     Defendants obtained and finalize mortgages to Ms. Colston's home under procedurally unconscionable circumstances.

58.     Ms. Colston's financial distress and vulnerability were readily apparent to Defendants. Defendants held a superior bargaining power.

59.     The terms of the transactions were substantially and procedurally unconscionable, unreasonably favorable to Defendants, and very grossly from the market rates to the detriment of Ms. Colston.  The mortgages offered and the methods of obtaining and finalizing the mortgages are so gross as to shock the conscience.

## COUNT IV
## ONE VIOLATIONS OF THE TRUTH IN LENDING ACT
## (AGAINST LEHMAN BROTHERS, AND DEFENDANT ASSIGNEES)

60.     Plaintiff repeats the allegations of the preceding paragraphs as if fully set forth herein.

61.     At all times relevant hereto, Lehman Brothers, in the ordinary course of their business, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments.

62.     At all times relevant hereto, Lehman Brothers were creditors within the meaning

of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

63.    TILA and Regulation Z mandate that all closed and consumer loans be accompanied by a Truth in Lending disclosure of material terms.  TILA, 15 U.S.C. § 1638, 1639; 12 C.F.R. § 226.18.  A general disclosure requirement is that the disclosures are clearly and conspicuously in writing.

64.    Lehman Brothers' TILA disclosures failed to include material terms.

65.    Lehman Brothers' TILA disclosures were not in a reasonably understandable form. The disclosures were presented in a way to obscure the relationship of the terms.

66.    Assignees of mortgages are liable for rescission under TILA.  15 U.S.C. § 1641(c).

67.    Accordingly, Defendant Lehman Brothers' violation of TILA entitle Ms. Colston to rescission as to the creditors and any defendant assignees under 15 U.S.C. § 1635 and § 1641(c), as well as to statutory damages under 15 U.S.C. § 1640, costs and attorney's fees pursuant to 15 U.S.C. § 1640.

## COUNT V
## VIOLATION OF THE MORTGAGE LENDERS AND BROKERS ACT
### (AGAINST FIRST GUARANTY)

68.    Plaintiff repeats the allegations of the proceeding paragraphs as if fully set forth herein.

69.    The Mortgage Loan and Broker Act, D.C. Code § 26-1101, *et seq.*, regulates loan disclosures and execution of agreements.

70.    A real estate broker or a real estate salesperson who received any fee, commission, kickback, rebate, or other payment for directly or indirectly negotiating, placing, or finding a mortgage loan for others is not exempt from the provisions.

71.    Defendant First Guaranty received fees or other payments for negotiating and placing Ms. Colston in the Lehman Brothers' mortgage and the Homecoming Financial mortgage.

72.    Defendant First Guaranty's violations of the Mortgage Lender and Broker Act were intentional, willful, and wanton and justify the imposition of treble and punitive damages, as well as attorney's fees and costs.

### REQUESTS FOR RELIEF

**WHEREFORE,** Plaintiff **Lillie Colston** respectfully asks this Court to award judgment against Defendants and the following relief:

A.  Award actual damages in an amount to be determined at trial;

B.  Award treble damages;

C.  Award punitive damages in an amount to be determined at trial;

D.  Award attorney's fees;

E.  Award reasonable costs of this action;

F.  Award Plaintiff equitable relief;

G.  Declare Plaintiff entitled to rescind her Lehman Brothers mortgage pursuant to

15 U.S.C. section 1635 and section 1641(c);

H.  Award such other and further relief as this court deems just and proper.

Respectfully submitted,

THE WILSON FIRM, LLC

Albert Wilson, Jr., Esq. (486546)
700 12th Street, NW, Suite 700

Lillie Colston Complaint - 13

# EXHIBIT 2

# FEDERAL STOCK CHARTER

# LEHMAN BROTHERS BANK, FSB

SECTION 1. Corporate Title. The full corporate title of the savings bank is Lehman Brothers Bank, FSB.

SECTION 2. Office. The home office shall be located in Wilmington, Delaware.

SECTION 3. Duration. The duration of the savings bank is perpetual.

SECTION 4. Purpose and powers. The purpose of the savings bank is to pursue any or all of the lawful objectives of a Federal savings bank chartered under section 5 of the Home Owners' Loan Act and to exercise all of the express, implied, and incidental powers conferred thereby and by all acts amendatory thereof and supplemental thereto, subject to the Constitution and laws of the United States as they are now in effect, or as they may hereafter be amended, and subject to all lawful and applicable rules, regulations, and orders of the Office of Thrift Supervision ("Office").

SECTION 5. Capital Stock. The total number of shares of all classes of the capital stock that the savings bank has the authority to issue is six million (6,000,000), of which five million (5,000,000) shall be common stock of par value of $1.00 per share and of which one million (1,000,000) shall be preferred stock, par value $1.00 per share. The shares may be issued from time to time as authorized by the board of directors without further approval of shareholders, except as otherwise provided in this section 5 or to the extent that such approval is required by governing law, rule, or regulation. The consideration for the issuance of the shares shall be paid in full before their issuance and shall not be less than the par value. Neither promissory notes nor future services shall constitute payment or part payment for the issuance of shares of the savings bank. The consideration for the shares shall be cash, tangible or intangible property (to the extent direct investment in such property would be permitted), labor, or services actually performed for the savings bank, or any combination of the foregoing. In the absence of actual fraud in the transaction, the value of such property, labor, or services, as determined by the board of directors of the savings bank, shall be conclusive. Upon payment of such consideration, such shares shall be deemed to be fully paid and nonassessable. In the case of a stock dividend, that part of the retained earnings of the savings bank that is transferred to common stock or paid-in capital accounts upon the issuance of shares as a stock dividend shall be deemed to be the consideration for their issuance.

Except for shares issued in the initial organization of the savings bank or in connection with the conversion of the savings bank from the mutual to the stock form of capitalization, no shares of capital stock (including shares issuable upon conversion, exchange, or exercise of other securities) shall be issued, directly or indirectly, to officers, directors, or controlling persons of the savings bank other than as part of a general public offering or as qualifying shares to a

director, unless there issuance or the plan under which they would be issued has been approved by a majority of the total votes eligible to be cast at a legal meeting.

Nothing contained in this section 5 (or in any supplementary sections hereto) shall entitle the holders of any class or a series of capital stock to vote as a separate class or series or to more than one vote per share, except as to the cumulation of votes for the election of directors, unless the charter otherwise provides that there shall be no such cumulative voting; **Provided**, that this restriction on voting separately by class or series shall not apply:

(i)   To any provision which would authorize the holders of preferred stock, voting as a class or series, to elect some members of the board of directors, less than a majority thereof, in the event of default in the payment of dividends on any class or series of preferred stock;

(ii)  To any provision that would require the holders of preferred stock, voting as a class or series, to approve the merger or consolidation of the savings bank with another corporation or the sale, lease, or conveyance (other than by mortgage or pledge) of properties or business in exchange for securities of a corporation other than the savings bank if the preferred stock is exchanged for securities of such other corporation; **Provided**, That no provision may require such approval for transactions undertaken with the assistance or pursuant to the direction of the Office or the Federal Deposit Insurance Corporation;

(iii) To any amendment which would adversely change the specific terms of any class or series of capital stock as set forth in this section 5 (or in any supplementary sections hereto), including any amendment which would create or enlarge any class or series ranking prior thereto in rights and preferences.  An amendment which increases the number of authorized shares of any class or series of capital stock, or substitutes the surviving savings bank in a merger or consolidation for the savings bank, shall not be considered to be such an adverse change.

A description of the different classes and series (if any) of the savings bank's capital stock and a statement of the designations, and the relative rights, preferences, and limitations of the shares of each class of and series (if any) of capital stock are as follows:

A.    Common stock.  Except as provided in this section 5 (or in any supplementary sections thereto) the holders of the common stock shall exclusively possess all voting power.  Each holder of shares of common stock shall be entitled to one vote for each share held by such holder and there shall be no right to cumulate votes in an election of directors.

Whenever there shall have been paid, or declared and set aside for payment, to the holders of the outstanding shares of any class of stock having preference over the common stock as to the payment of dividends, the full amount of dividends and of sinking fund, retirement fund, or other retirement payments, if any, to which such holders are respectively entitled in preference to the common

stock, then dividends may be paid on the common stock and on any class or series of stock entitled to participate therewith as to dividends out of any assets legally available for the payment of dividends.

In the event of any liquidation, dissolution, or winding up of the savings bank, the holders of the common stock (and the holders of any class or series of stock entitled to participate with the common stock in the distributions assets) shall be entitled to receive, in cash or in kind, the assets of the savings bank available for distribution remaining after: (i) Payment or provision for payment of the savings bank's debts and liabilities; (ii) distributions or provisions for distributions in settlement of its liquidation account; and (iii) distributions or provisions for distributions to holders of any class or series of stock having preference over the common stock in the liquidation, dissolution, or winding up of the savings bank. Each share of common stock shall have the same relative rights as and be identical in all respects with all the other shares of common stock.

B.    Preferred stock. The savings bank may provide in supplementary sections to its charter for one or more classes of preferred stock, which shall be separately identified. The shares of any class may be divided into and issued in series, with each series separately designated so as to distinguish the shares thereof from the shares of all other series and classes. The terms of each series shall be set forth in a supplementary section to the charter. All shares of the same class shall be identical except as to the following relative rights and preferences, as to which there may be variations between different series:

(a)    The distinctive serial designation and the number of shares constituting such series;

(b)    The dividend rate or the amount of dividends to be paid on the shares of such series, whether dividends shall be cumulative and, if so, from which date(s) the payment date(s) for dividends, and the participating or other special rights, if any, with respect to dividends;

(c)    The voting powers, full or limited, if any, of such shares of such series;

(d)    Whether the shares of such series shall be redeemable and, if so, the price(s) at which, and the terms and conditions on which such shares may be redeemed;

(e)    The amount(s) payable upon the shares of such series in the event of voluntary or involuntary liquidation, dissolution, or winding up of the savings bank;

(f)    Whether the shares of such series shall be entitled to the benefit of a sinking or retirement fund to be applied to the purchase or redemption of such shares; and if so entitled, the amount of such fund and the manner of

4

its application, including the price(s) at which such shares may be redeemed or purchased through the application of such fund;

(g)   Whether the shares of such series shall be convertible into, or exchangeable for, shares of any other class or classes of stock of the savings bank and, if so, the conversion price(s) or the rate(s) of exchange, and the adjustments thereof, if any, at which such conversion or exchange may be made, and any other terms and conditions of such conversion or exchange;

(h)   The price or other consideration for which the shares of such series shall be issued; and

(i)   Whether the shares of such series which are redeemed or converted shall have the status of authorized but unissued shares of serial preferred stock and whether such shares may be reissued as shares of the same or any other series or serial preferred stock.

Each share of each series of serial preferred stock shall have the same relative rights as and be identical in all respects with all the other shares of the same series.

The board of directors shall have authority to divide, by the adoption of supplementary charter sections, any authorized class of preferred stock into series, and, within the limitations set forth in this section and the remainder of this charter, fix and determine the relative rights and preferences of the shares of any series so established.

Prior to the issuance of any preferred shares of a series established by a supplementary charter section adopted by the board of directors, the savings bank shall file with the Secretary to the Office a dated copy of that supplementary section of this charter established and designating the series and fixing and determining the relative rights and preferences thereof.

SECTION 6.  Preemptive rights. Holders of the capital stock of the savings bank shall not be entitled to preemptive rights with respect to any shares of the savings bank which may be issued.

SECTION 7.  Directors. The savings bank shall be under the direction of a board of directors. The authorized number of directors, as stated in the savings bank's bylaws, shall not be fewer than five nor more than fifteen, except when a greater or lesser number is approved by the Director of the Office, or his or her delegate.

SECTION 8.  Amendment to charter. Except as provided in Section 5, no amendment, addition, alteration, change or repeal or this charter shall be made, unless such is proposed by the board of directors of the savings bank, approved by the shareholders by a majority of the votes eligible to be cast at a legal meeting, unless a higher vote is otherwise required, and approved or pre-approved by the Office.

31

5

ATTEST:

Secretary

ATTEST:

Corporate Secretary of the Office
of Thrift Supervision

LEHMAN BROTHERS BANK, FSB

By: _____
    President

OFFICE OF THRIFT SUPERVISION

Scott M. Albinson, Managing Director
Office of Supervision

Effective Date: _____June 30_____, 1999

32

# EXHIBIT 3

## 2009 CA 001864 B COLSTON, LILLIE W Vs. FIRST GUARANTEE COMMERCIAL MORTGAGE CORPORATION

| **File Date** 03/14/2009 | **Case Status** Open | **Case Status Date** 03/14/2009 |
|---|---|---|
| | **Case Disposition** Undisposed | **Case Disposition Date** |

### Party Information

| Party Name | Party Alias(es) | Party Type | Attorney(s) |
|---|---|---|---|
| COLSTON, LILLIE W | | PLAINTIFF | WILSON, JR, ALBERT |
| FIRST GUARANTEE COMMERCIAL MORTGAGE CORPORATION | | Defendant | |
| LEHMAN BROTHERS BANK, FSB | | Defendant | |

### Case Schedule

| Date | Start Time | Event Type |
|---|---|---|
| 06/26/2009 | 09:00 AM | Initial Scheduling Conference-60 |

### Docket Entries

| Date | Text |
|---|---|
| 04/14/2009 | Proof of Service Method : Service Issued Issued : 03/16/2009 Service : Summons Issued Served : 04/06/2009 Return : 04/14/2009 On : LEHMAN BROTHERS BANK, FSB Signed By : K. A. Reason : Proof of Service Comment : Tracking #: 5000058863 |
| 04/14/2009 | Affidavit of Service of Summons & Complaint by Mail on LEHMAN BROTHERS BANK, FSB (Defendant); |
| 04/14/2009 | Proof of Service Method : Service Issued Issued : 03/16/2009 Service : Summons Issued Served : 03/31/2009 Return : 04/14/2009 On : FIRST GUARANTEE COMMERCIAL MORTGAGE CORPORATION Signed By : M.J.K. Rancourt Reason : Proof of Service Comment : Tracking #: 5000058862 |
| 04/14/2009 | Affidavit of Service of Summons & Complaint by Mail on FIRST GUARANTEE COMMERCIAL MORTGAGE CORPORATION (Defendant); |
| 03/16/2009 | Issue Date: 03/16/2009 Service: Summons Issued Method: Service Issued Cost Per: $ FIRST GUARANTEE COMMERCIAL MORTGAGE CORPORATION 7201 Downing court CLARKSVILLE, MD 21029 Tracking No: 5000058862 LEHMAN BROTHERS BANK, FSB 1000 West Street Suite 200 WILMINGTON, DE 19801 Tracking No: 5000058863 |
| 03/14/2009 | Event Scheduled Event: Initial Scheduling Conference-60 Date: 06/26/2009 Time: 9:00 am Judge: COMBS GREENE, NATALIA Location: Courtroom 217 |
| 03/14/2009 | Complaint for Deceit (Misrepresentation) Filed Receipt: 128792 Date: 03/14/2009 |

### Financial Entries

| Receipt # | Date | Received From | Amount Paid |
|---|---|---|---|
| 128792 | 03/14/2009 | WILSON Jr, ALBERT | 120.00 |
| | Payment | Fee | |

| Check | 120.00 | Cost | 120.00 |

# EXHIBIT 4



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

LILLIE W COLSTON
    Vs.                                  C.A. No.      2009 CA 001864 B
FIRST GUARANTEE COMMERCIAL MORTGAGE CORPORATION
## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge  Lee F. Satterfield

Case Assigned to:  Judge NATALIA COMBS GREENE
Date:   March 14, 2009
Initial Conference: 9:00 am, Friday, June 26, 2009
Location:  Courtroom 217
          500 Indiana Avenue N.W.
          WASHINGTON, DC 20001

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc